Filed 4/3/14  P. v. Runnels CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055824 |
| v. | (Super.Ct.No. RIF148790) |
| JASON RUNNELS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Gary B. Tranbarger, Judge.  Affirmed with directions.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anthony DaSilva and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted defendant, Jason Runnels, of first degree murder (Pen. Code, § 187, subd. (a)).[1] In bifurcated proceedings, he admitted having suffered two prior convictions for which he served prison terms. (§ 667.5, subd. (b).) He was sentenced to prison for 25 years to life plus two years and appeals, claiming the prosecutor should not have commented on his silence, the jury was misinstructed, the evidence was insufficient to support the verdict and the sentencing court should have ordered that restitution be joint and severable with his codefendant. Based on the parties agreement, we direct the trial court to amend the abstract of judgment and minutes of the sentencing hearing to reflect the latter, while rejecting defendant's remaining contentions and otherwise affirming.

## FACTS

The witness, who was granted use immunity for her testimony, did not want to testify and said she was afraid, testified that on New Year's Eve 2008, she had been staying with the defendant and his girlfriend (hereinafter, the codefendant) at the couple's one bedroom cabin in Poppet Flats since December 30th. Defendant called the victim, whom he had met while both were in prison,[2] to come over to celebrate the New Year, which the victim did. After buying hard liquor at Wal-Mart, all four returned to the cabin and listened to music in the living room. Either all four or all but the witness began to

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Defendant testified to this.

drink and defendant and the codefendant danced to the music, while the witness and the victim sat on the couch. The witness was not intoxicated. The victim put his hand on the witness's leg and she removed it, then brought this to the codefendant's attention. While the defendant was in the kitchen, the codefendant continued to dance and the victim tried to dance with her by putting his hands on her hips. She pushed him away and went into the kitchen. The victim sat down and began talking to the witness. Two minutes later, defendant and the codefendant came out of the kitchen. Defendant asked the victim to accompany him to the bedroom, both went inside and the door closed. After several minutes, the codefendant joined defendant and the victim in the bedroom, closing the door. The witness then heard one or two thumps coming from the bedroom, like someone was getting hit, or was hitting something or was bouncing off the floor. The witness turned down the music in the living room to better hear what was going on in the bedroom. The codefendant came out of the bedroom, turned up the music, asked the witness not to make or receive any calls on her cell phone, and asked where her cell phone was. She also asked the witness what the latter had heard. The witness told the codefendant where her cell phone was and that she had heard thumping. The codefendant took the witness's phone either then, after telling the witness not to answer the phone, which was ringing, or at some other time. The codefendant returned to the bedroom, once again closing the door. The witness may have heard[3] around five sounds

_____

[3] We say "may" because at trial, the witness initially testified to hearing the thumping at this point, but was impeached with her pretrial statements to the case agent

*[footnote continued on next page]*

of thumping, louder than the initial noises, and lasting for several minutes. The defendant and codefendant then came out of the bedroom. Neither had visible injuries or blood visible on them and the codefendant had no injuries to her hands, although she later complained that her fingernail was broken. They told the witness that she could not go anywhere, she had to stay with them and she could not make any phone calls. They had her cell phone, but she was unsure at what point they had gained possession of it or which of the two had taken it. All three sat down in the living room. With the defendant right behind her, the codefendant told the witness that if the latter said anything, they would "take the closest one to her."[4] At the time, the witness had a four year old son, who was living in the Banning area, and she believed the reference was to him. Defendant went into the bedroom and emerged, dragging the victim's lifeless body, his face having been beaten, and defendant deposited the body on the living room floor. The three again sat down and the codefendant asked defendant what they were going to do with the victim's body. All three discussed this. Defendant replied that they'd figure something out. The codefendant appeared to be afraid. At some point, the witness noticed that defendant's hand was swollen. Defendant and the codefendant told the witness to help with the body and, out of fear, she assisted them in dragging it though the kitchen outside, where it was

and at the preliminary hearing that she did not hear a second set of thumping; she also acknowledged that she had additionally testified at the preliminary hearing that she did hear the second set and she admitted that she was not "entirely sure."

[4] The witness also testified that she could not remember if the codefendant had made this threat after the first set of thumps or after all the thumping was over.

placed in the victim's car after defendant had parked the car in the garage. While the victim's body was in his car, defendant tied a rope around the victim's wrists, which were placed behind his back, and around his ankles and he tied the rope to a cinder block. All three returned to the cabin and slept in the living room, very close together, the witness feeling she had no choice but to remain in their presence.[5]

The next day, defendant went to work, and the codefendant directed the witness to help her clean up some of the blood that was in different places in the bedroom. The witness felt she had no choice but to help. The codefendant then had the witness take her in the witness's car to Banning, where the codefendant visited with family members. The witness could not get away from the codefendant and the latter had the witness's cell phone. That night, defendant, the codefendant and the witness made another attempt to clean up the blood in the bedroom. They discussed what to do with the victim's body and decided to put it in a nearby lake. Beneath the cover of darkness, defendant drove the victim's car, with the victim's body in the passenger seat, and the witness, driving her car, with the codefendant as her passenger, followed. After parking near the lake, all three carried the victim's body to a bridge and dropped it into the lake. The codefendant appeared to be afraid. The witness felt she had no choice but to participate in this. Continuing to drive her car with the codefendant as her passenger, the witness followed defendant, driving the victim's car, to Joshua Tree. The codefendant still had possession

---

[5] The previous night, she had slept in the bedroom while defendant and the codefendant slept in the living room.

5

of the witness's cell phone. The women lost sight of defendant, but eventually picked him up after he had abandoned the victim's car in a sparsely populated area. Defendant had a red gas can and he smelled of gasoline. They stopped at a gas station where defendant paid to have the witness's car gassed up.[6] The following day, defendant went to work and the witness and the codefendant again went to Banning, but the codefendant gave the witness her cell phone back, as the later was applying for a drug treatment program and needed it.

The prosecution produced evidence that on January 7, 2009, the victim's clothes and wallet were found in a dumpster at a fenced-in job site where defendant worked. When asked about the wallet by both his coworker and his supervisor, defendant denied knowing the victim.

Surveillance video of the four at Wal-Mart and the codefendant and the witness in the witness's car at the gas station were shown to the jury. The station was a few miles from where the victim's car had been abandoned. Inside the car was a greasy residue in areas that would be touched by someone using the car, and an envelope bearing the address of the cabin was on the front passenger seat. There was also gasoline residue in the car. The victim's blood was found in the bedroom of the cabin and in his car. Areas of the carpet in the cabin's bedroom had been cleaned and dyed. A web map from the victim's home in Brea to the cabin was found on the victim's home computer. There

---

[6] A picture of the witness's car at the gas station was introduced into evidence.

were calls between the victim's and defendant's cell phones for the afternoon and early evening of December 31, 2008. Calls made on the victim's cell phone that evening pinged off towers in Banning and Beaumont. There were calls from the codefendant's cell phone to defendant's during the evening of January 1st and some pinged off towers near where the victim's car had been abandoned. These calls traced the movement the witness claimed the three had made from the cabin to where the victim's car had been abandoned.

About two months after the murder, the victim's body, filled with gasses from decomposition, floated to the surface of the lake. Cinderblock and rope similar to that attached to the victim's body were found at the cabin. Calls made on the codefendant's cell phone between January 10 and 16, 2009 traced a journey from Banning to Pennsylvania. In April 2009, the codefendant was found by law enforcement in Georgia. According to defendant's testimony, the codefendant left the cabin either on January 2 or two days later and never returned, although he remained there until he was arrested for a parole violation. Voicemail messages left by defendant for the victim after the victim was dead were played for the jury. In the voicemails, defendant expressed love for the victim and acted as though the victim was still alive.

A pathologist testified that the victim had a non-fatal laceration above his nose Due to the passage of time with the body in the water, it was impossible to tell if some marks on the victim's face were due to injury or decomposition or whether there had been injuries to the surfaces of his hands or back. His hands were still tied behind his

7

back. Four front ribs on the right side had been broken. Eight ribs on the back right were broken. Seven ribs on both the left front and the left back had been broken. The pathologist testified that the breaks were "to almost all the ribs of [the] body" as there are 12 on each side. The rib fractures were caused by "a lot of trauma" and could not have been caused by one or two blows, but by a "multitude" of them—at least 10 and probably more than 15 or 16. The pathologist doubted that they could have been caused by the victim hitting the ground. He had never seen a victim with that number of rib fractures who had merely been hit once and tackled to the ground. The lower lobe of the victim's left lung and his liver had been lacerated by broken ribs. But, because the lacerations were not that large, the victim could have lived for 15-20 minutes after the beating. The victim's sternum was also fractured. The cause of death was blunt force chest and abdominal trauma, resulting from "multiple impacts to the [victim]." The pathologist opined that the victim would not have been able to breathe properly with all the breaks to his ribs, that he bled from those breaks and that his lungs and liver were punctured. He said that holding on to the victim and kneeing him with a leg or kicking him would result in a greater application of force than merely hitting the victim with a fist.

During questioning the first time, in January 2009, defendant told a law enforcement officer that he knew the victim from prison, but the victim had not been to the cabin on December 31, 2008. When the officer told defendant that the victim's cell phone had pinged off a cell phone tower near the cabin on December 31 and the envelope with the cabin's address on it had been found in the victim's abandoned car, defendant

8

admitted that the victim had been coming to see him at the cabin on his way to Vegas on the 31st, but never made it. Defendant asserted that he and the victim were "buddies" and he was concerned about him. He also said he was alone on December 31 at the cabin. A few days later, the officer questioned defendant again because defendant's sister-in-law had told the police that defendant was with the codefendant at the cabin on December 31. This time, defendant admitted that the codefendant had been with him. Another officer present suggested that perhaps the victim had come to the cabin and overdosed or that something bad had happened, but defendant said that the victim never arrived at the cabin. In the first story defendant told this officer, he reverted to the claim that he was home alone on New Year's Eve, although he admitted knowing the victim. When this officer confronted defendant about finding the victim's wallet at the construction site, defendant denied knowing about it and denied ever being in the victim's car. He later told this officer that he was with the codefendant that night at the cabin and the witness had come up there that same night with the codefendant, but he did not know the witness's name. He said the victim was supposed to come to the cabin, but went to Vegas instead. After this officer mentioned the Wal-Mart security video and showed defendant a still photo from it, defendant admitted that the victim had come to the cabin that night. In this last story to law enforcement, defendant said that the four had a great time that night, and the victim and the witness slept in the bedroom while defendant and the codefendant slept on the living room couch, and that he and the victim spent time together the next day, then the victim left.

The codefendant presented no evidence at trial and did not testify. Defendant

testified that the witness had begun a relationship with the victim, his "brother" in prison

and "best friend,[7]over the phone prior to New Year's Eve, 2008.[8] Before going to Wal-

Mart that night, the witness and the victim had gone into the bedroom of the cabin and

when the witness emerged, she told defendant that the victim was "a weenie" because he

talked "lovey-dovey" to her. Defendant informed the victim that the witness had said

that she wanted to have fun "without strings," so the victim should not try to romance

her. Defendant offered to sleep on the couch in the living room while the victim and the

witness used the bed in the bedroom. Defendant told the victim that he would smooth

things out between the victim and the witness. That was achieved after the trip to Wal-

Mart, as the four danced in the living room. Defendant denied that the victim ever tried

to dance with the codefendant and he said that if he had, and tried to put his hands on her

hips, it would not have made him mad. The witness grabbed the victim's hand and they

walked into the bedroom. Two minutes later, the sound of a loud smack came from

inside the bedroom, and the codefendant told defendant to go in there. Both went in and

saw the witness and the victim standing face to face, yelling at each other. Defendant

jokingly asked the victim if he had "struck out." The codefendant told defendant that the

---

[7] Ironically, defendant testified that he had not seen the victim since being paroled in August 2008, even though the victim lived in Brea and defendant lived in Poppet Flats.

[8] In contrast to the witness's testimony, defendant said that the witness had been staying with him and the codefendant at the cabin for at least a week and a half prior to New Year's Eve. Later, he testified it was two to three weeks.

witness had told her that the victim had "tried to take the pussy." The victim made a derogatory remark about both women and suggested that he and defendant go elsewhere for sexual favors. The witness cussed the victim out and they resumed yelling at each other. The victim repeated his suggestion, including the colorful language, to defendant, adding that the cabin was *defendant's* home. Defendant told the victim to watch his mouth around the codefendant and suggested that everyone stop. The victim twice repeated his derogatory remark about the women, which resulted in the codefendant reaching over defendant and slapping the victim in the face. Either the victim took a step back, which defendant interpreted as an act of aggression against the codefendant or he began coming forward as though he was going after the codefendant, so defendant pushed the victim across the room and again ordered him out.[9] In response to leading questions by trial counsel for the codefendant, defendant testified that when the victim took a step back, he felt the codefendant was going to be harmed right at that moment and

---

[9] Defendant did not testify that the victim came forward towards the codefendant during his direct examination, testifying only that when the victim took a step back, defendant interpreted that as "an aggression, he was going to go after [the codefendant]." It was not until cross-examination by counsel for the codefendant that the latter led defendant as follows, "Once [the victim] started to move towards [the codefendant] and looked like he was attacking [the codefendant] at some point in time, . . . did you feel as if at that moment in time in your mind that [the codefendant] was going to be harmed? The prosecutor objected on the basis that the question misstated evidence, which it had, but his objection was overruled and defendant responded in the affirmative. Counsel for the codefendant then attempted to further lead defendant by asking, "Did you feel in your mind at that moment in time that the harm to [the codefendant] was going to happen right now . . . [¶] [o]r at some point in the future?" Almost comically failing to take the bait, defendant responded, "Right now."

11

he needed to use some type of force to protect her from harm.[10]  However, during cross-examination, defendant testified that when he later kneed the victim, the women were not in the room and the kneeing had nothing to do with them.  The victim fell, then got up and approached defendant and the codefendant on what defendant believed was his way out the door, but, instead, he began hitting defendant.[11]  Defendant struck back, hitting the victim in the face and knocking him down—"get[ting] the better of him."  The victim got back up slowly and the two women left the room, closing the door behind them.[12]  Defendant asked the victim what was going on.  The victim rushed at defendant with his fists swinging, although he did not connect with defendant, and defendant "lit into" him, hitting him in the face, and "dropped" him again.  With his head down, the victim rushed defendant again and grabbed on to the latter's waist, pinning his arms to his side.  Both stumbled into the bedroom wall.  The victim tried to wrestle defendant, which defendant described as the victim "wrestling with his [*sic*] self" due to the fact that defendant outweighed the victim by 50 or 60 pounds and the victim was trying to throw both of them across the room.  Defendant testified that this effort by the victim "wasn't really

---

[10] Impeachment of defendant's claim, such as it was, that he was protecting the codefendant, will be discussed in connection with the first issue, *infra*.

[11]  Defendant later testified that the victim threw more than one punch at him, but connected one good one to his face.

[12] During cross-examination, defendant testified that the women left the room as soon as he knocked the victim to the ground.

doing nothing" until the victim tried to throw defendant along with himself through the bedroom window, but a blanket hung over it kept both inside the room, although the impact broke the window.**13** At that point, defendant believed he was fighting for his life. Defendant freed his arms, although the victim continued to hold onto his waist with his head down, and defendant began "wailing on [the victim's] backside" with all his strength with his fists, "fighting for [his] life." The victim loosened his grip on defendant's waist and defendant tried to push him back, but the victim came forward at defendant.**14** So, defendant grabbed the victim's shoulders and while holding on to him, with his back against the window, kneed him several times in the chest, and possibly in the face, using both knees and all the force he could muster. As defendant began kneeing the victim, the latter let go of defendant. Defendant repeated that he was "fighting for his life" and "trying to get [the victim] off [him]" while he was kneeing the victim.**15** Defendant denied that he was trying to kill the victim then or earlier. The victim rose up and put his arms up. Fearing that the victim was coming at him again, defendant

---

**13** Defendant testified that he did not know if the victim was trying to throw him through the window, but he might have been trying to throw him onto the ground.

**14** During cross-examination by the prosecutor, defendant gave a different version of what occurred between him and the victim at this point. He said that the victim did not loosen his grip on him, but continued to try to throw defendant across the room, so defendant grabbed him by the shoulders and began kneeing him.

**15** When asked if the fight was one-sided at this point, defendant responded on cross-examination by the prosecutor that he was defending himself against the victim's continuing to charge at him.

"defended [him]self" and "was fighting for his life" by "open[ing] fire on his chest" and the victim fell back, hitting the ground.[16] Defendant thought he had knocked the victim out, but not inflicted fatal injuries, although the victim was bleeding from his nose and mouth. Defendant stepped over the victim's feet, left the room and slammed the door. Defendant was "pissed off" as, in his opinion, "[t]he whole night [had been] ruined." Defendant went outside where he smoked. The women asked defendant what had happened and he replied that he "had to fight with [the victim]." Defendant checked on the victim a couple of hours later and the latter was dead.

When asked if he noticed that the victim was having trouble breathing during their confrontation, defendant responded that he was "trying to defend [him]self" and observed the victim only to the extent that he was able to notice when the latter was coming at him.

Defendant denied that he heard the codefendant tell the witness not to make any phone calls or to give her the latter's cell phone. He also denied that either he or the codefendant told the witness that they would "take someone closest to [the witness]."

Defendant admitted that he moved the victim's car into the garage and the three of them put his body into it, after the three decided to do this. He admitted tying the cinder block to the victim and that the three of them slept in the living room together that night. He denied that he or the codefendant threatened the witness that night or the next day. He admitted that he and the women tried to clean up the blood in the bedroom the

---

**16** Impeachment of defendant's claim that he was acting in self-defense will be discussed in connection with the first issue, *infra*.

14

following day and he bleached and dyed the bedroom carpet. He admitted that the three went to the lake, dumped the victim's body that night, much in the same way the witness had described it. He admitted putting gasoline from a gas can on the interior and exterior of the victim's car[17] before he abandoned it. Just before driving the car to the spot where he abandoned it, he had gotten separated from the women, so he called the codefendant on his cell phone and they eventually found him and picked him up. They then went to the gas station where they filled up the witness's car, then returned to the cabin. He admitted throwing the victim's backpack and its contents, including the victim's shirt and jacket, in the dumpsters at the construction site and at the office on January 2, when he went to work, and six to seven days later, doing the same to the victim's wallet. He admitted that he told both his supervisor and his coworker that he did not know anything about the victim's wallet when they confronted him about finding it in the dumpster, even though he assumed that his coworker had told his supervisor that the coworker had seen defendant near the dumpster.

Defendant also testified that except for his periods of incarceration, during which the codefendant wrote to him, they had been together since 2002. His devotion to her was so strong that he would die for her, he had her name tattooed next to his eye and on his wedding ring finger and, he considered her to be his wife, although they were not legally married. Defendant had the facial tattoo during the two years he had known the

---

[17] He intended to set the car on fire, then decided that the blaze might attract attention.

15

victim in prison, he had discussed with the victim his feelings for the codefendant "a lot" during that time and the victim was aware of how strong defendant's feelings were for the codefendant. Defendant's children considered her to be their stepmother and her children considered him to be their stepfather. She had had his name tattooed on her neck during one of his incarcerations.

ISSUES AND DISCUSSION

1. *Prosecutor's Cross-Examination of Defendant Concerning His Silence*

During cross-examination of defendant, the prosecutor asked him if the version of events he gave during his direct testimony was the first time he had ever given this version. Defendant answered that it was—the first time *ever*. Defendant said that all the other versions he had given were lies, motivated by his "shame" over what had happened and his concern for what would happen to him because of it. Then the prosecutor asked, "The first time you ever mentioned that you needed to protect [the codefendant], that was when [the codefendant's attorney] just led you into that [during his cross-examination of you]. Right?" Defense counsel's objection on the basis that the question misstated evidence was overruled and defendant said that he had not been led into his claim by counsel for the codefendant. Defendant admitted that he had left messages on the victim's cell phone the day after he killed the victim and a week after that in order to "cover himself." He said that during these messages, he mentioned that the victim's family had called him. However, he admitted that when the victim's family had called him, even though they had expressed concern about where the victim was, he had not told

16

them the victim's location.  Defendant admitted that as he was confronted with facts while being questioned by law enforcement during a series of interviews, he incorporated those facts into each of his five versions of what had occurred, all the while asserting he was telling the truth during each version.  Defendant admitted that in all these versions, he had never once mentioned self-defense or that he was in fear for his life, even though one of the law enforcement officers who questioned him specifically told defendant that if someone overdosed or "something else happened" to just let her know.  Defendant also admitted that the other officer had told him that "sometimes accidents happen" and if defendant did not tell the truth then, and later tried to change his story to tell the truth, he might not be believed and the interview was defendant's opportunity to give him a "reasonable explanation [for the victim's death], something was an accident or wasn't planned."  Despite this, defendant did not mention "anything like" what he testified to at trial.  Defendant admitted he did not tell the second officer, when the latter questioned him prior to his arrest, the truth about what had happened, even though he was confident that the truth would result in proving that he was innocent.  In fact, defendant volunteered that he "never" told this officer "the truth."  Counsel for defendant objected to none of the questions that elicited the foregoing testimony.  Then began the testimony to which defendant now takes issue, thusly,

"[THE PROSECUTOR]:  When the [victim's] family was looking for him and calling you, and you knew that they at least needed closure to find the body of their loved one that you had earlier beaten, you didn't tell them?

17

"[DEFENDANT]: No . . . ."

Defendant then denied that the version of the story he gave at trial was merely an attempt to fit it to the facts that had already been proven. Defendant spontaneously added, "This is the only time I could tell [the victim's] family and the people the truth, what had happened."

The prosecutor then asked, "When the [family] gave you a call and talked to you, could you tell them the truth then?" Defendant replied that he could have had he not been so scared and "mind-twisted." The prosecutor then solicited from defendant that he has access to phones where he currently is. In response to the prosecutor's question whether defendant ever called the victim's family after his mind was no longer "twisted" and told them what had actually happened to the victim, defendant said that he did not because he did not have their phone number. In response to the prosecutor's question whether defendant called law enforcement and told them that he was no longer "twisted," defendant said he did not, but for different reasons. Finally, defendant denied that he was covering up for the codefendant by testifying that she was not involved. Counsel for defendant objected to none of the prosecutor's questions regarding the foregoing testimony.

During redirect, counsel for defendant elicited from defendant that from the time he had been arrested to that day, he had been represented by counsel, who advised him not to speak to anyone, including law enforcement, the victim's family and defendant's fellow jail inmates during his two year pre-trial/during-trial incarceration. Defendant also

18

testified that he was aware during his incarceration that all his phone calls and face-to-face visits were recorded and all his mail was screened.

During the discussion on jury instructions, counsel for defendant reported that he had offered the following instruction, "On cross-examination the prosecutor asked the defendant if this was the first time he had told anyone th[e] story [he told during his direct testimony]. Further, he asked if after being arrested and before trial he had made any efforts to call the police, the family or anyone to tell his story. This questioning was improper, since the defendant has a right to not talk to anyone about the case. And this fact cannot be used against him. You are ordered to disregard any questions and answers related to this topic."

The trial court declined to give the instruction, reasoning as follows,[18] " . . . [T]he series of questions [by the prosecutor] were prompted by an unresponsive answer that the

---

[18] The trial court began the discussion about the instruction by saying, "Earlier this morning there was a request made by [d]efendant . . . for a special admonition to the jury, actually I think it was a request for mistrial, which was denied, and an admonition to the jury regarding the series of cross-examination questions that were asked of the defendant . . . ." However, the reporter's transcript contains no such request or denial. The minutes for that date reflect that after proceedings were adjourned for lunch at noon, that a motion for a mistrial was called for a hearing and denied, after which the trial court denied defendant's request to have the special instruction given to the jury. While the reporter's transcript for this period shows that a discussion was held off the record between the trial court and counsel, after which the trial court denied defendant's request to have the instruction given to the jury, we cannot fathom the court reporter failing to report something as significant as a motion for mistrial and the ruling thereon. Rather, we believe the trial court was incorrect when it said that defendant had made a motion for a mistrial earlier that morning, which it had denied.

19

defendant gave to the e[ffect] that this . . . trial [is h]is first chance or only chance to tell the family.  Based on that assertion by the defendant it was appropriate cross-examination [by the prosecutor] to point out that the defendant made no efforts on his own prior to trial to contact the family.  [¶]  However, [the prosecutor's line of questioning] was only for the purposes of testing the accuracy of [defendant's] statement 'this is my only chance.'  . . .  It would be improper to use that questioning and those answers for any other purpose.  I am prepared to admonish the jury as to the limited nature of th[ose] question[s] and answers if [d]efendant . . . wishes.  But I'm not willing to grant a mistrial, nor am I willing to give the special admonition as drafted."

It was at that point that counsel for defendant first asserted that the prosecutor had committed *Doyle*[19] error in asking the questions he had.  Specifically, counsel contended that asking defendant if "he ever had . . . reached out to the family before trial, that includes the two years that he's been incarcerated" is a commentary "on the defendant's exercise of his Constitutional right . . . to remain silent [a]nd . . . to counsel . . . post-arrest . . . ."  Counsel for defendant went on to say that the prosecutor had "compounded" the error by going into the fact that "while [defendant has] been [awaiting] trial, represented by counsel, . . . he didn't call the police . . . ."  At that point, counsel for defendant moved for a mistrial or for the court "to give a more complete admonition[,]" although he did not specify what this should be.  Counsel for defendant conceded that it

---

[19]  *Doyle v. Ohio* (1976) 426 U.S. 610.

20

was proper for defendant to be questioned about his silence between the time of the crime and defendant's arrest, however, he objected to any reference to defendant's failure to talk during the post-arrest period. The trial court again asked counsel for defendant if he wanted an admonishment as to the limited use of this evidence. Counsel said this was inadequate and constituted a violation of defendant's right to counsel and due process.

Defendant here asserts that the admission of the disputed evidence constituted a comment on his post arrest silence in violation of *Doyle*. First, as the People correctly observe, defendant failed below to object to any of the questions asked by the prosecutor, and, therefore, waived whatever error occurred in admitting the testimony. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 118.) Second, by spontaneously asserting on the stand that the trial was his first opportunity to tell the victim's family the version of the events he told at trial, defendant opened the door to impeachment of this assertion by the prosecutor. The trial court offered to instruct the jury that it could consider this evidence only for that purpose, but defendant declined the offer. That was *his* mistake, not the trial court's. Next, the first sentence of defendant's proposed instruction contradicted his concession during discussion of it/his motion for mistrial that it was entirely proper for defendant to be questioned about any contact he made with the family before his arrest. Further, in light of the many references defendant made during his earlier cross-examination, which were not objected to by his attorney, to the effect that the story he told at trial was different than any of the five previous stories he had told law enforcement, and that they were different from each other, defendant cannot possibly

21

claim he was prejudiced by admission of this evidence. Moreover, defendant *volunteered* that he *never* told the second officer who questioned him the version he offered at trial. As to defendant's failure to speak to the victim's family after defendant was arrested and *Mirandized*,[20] defendant cites no authority holding that *Doyle* error occurs when a defendant fails to communicate with a victim's family. No doubt this is because *Doyle* prohibits the use of a defendant's silence "in the wake of *Miranda* warnings." (*Doyle v. Ohio*, *supra*, 426 U.S. at p. 617 [96 S.Ct. 2240].) *Miranda* warnings have nothing to do with a defendant's communication with people outside law enforcement. Indeed, "absent the sort of affirmative assurances embodied in the *Miranda* warnings, the Constitution does not prohibit the use of a defendant's postarrest silence to impeach him at trial." (*Greer v. Miller* (1987) 483 U.S. 756, 763 [107 S.Ct. 3102; accord, *Fletcher v. Weir* (1982) 455 U.S. 603, 605 [102 S.Ct. 1309].) We further note that defendant's proposed instruction failed to make a distinction between his failure to talk to the victim's family and to the police.

As to defendant's failure to communicate with law enforcement after his arrest, aside from the waiver matter, we note that there is no evidence that defendant was *Mirandized*. Additionally, on redirect, defendant asserted that he did not speak on the advice of his attorney, and counsel was not appointed for defendant until more than a

---

[20] *Miranda v. Arizona* (1966) 384 U.S. 436.

22

month after his arrest.**21** We also observe that the relevancy of this evidence was to show that defendant failed to disclose to police what he asserted at trial was the truth, thus suggesting that he fabricated the version he told at trial. However, the fact that defendant fabricated five prior versions of the story to police went a long way in impeaching his credibility on the stand. Additionally, defendant volunteered that he never told the second officer who interviewed him the version he gave at trial. Moreover, defendant was able to explain, during redirect examination, that he did not speak to either the family or the police after he was arrested on advice of counsel, and knowing that all his communications would be recorded in one manner or another. Thus, even if it was error to have admitted this evidence, it was not prejudicial, even under the *Chapman* standard (*Chapman v. California* (1967) 386 U.S. 18 [the error complained of beyond a reasonable doubt did not contribute to the verdict]) in light of the un-objected to evidence that defendant told six different versions of the facts. Finally, defendant's failure to tell the

---

**21** Defendant asserts in his reply brief that he was arrested on March 11, 2009, citing, presumably, the first page of his probation report. While the report states that he was arrested on March 11, defendant, himself, in addition to the case agent, testified that he was arrested for the victim's murder the day the case agent and another detective interviewed him. According to the transcript of that interview, it took place on February 20, 2009. In contrast to this, defendant also testified, in response to leading questions by his attorney, that "this entire time after [he had been] arrested until [the day he testified] he had been represented by a lawyer" which, defendant added, had been trial counsel "for the past year." Defendant testified on February 17, 2011 and a year before that would have been February 2010. Even if he had been arrested on March 11, 2009, this would have been almost an entire year before February 2010. Defendant also testified that it was attorney Samuel Long who advised him not to speak to anyone, yet Mr. Long was not appointed to represent defendant until March 27, 2009.

23

victim's family what he knew was, in light of defendant's professed love for the victim, as prejudicial, if not more so, than defendant's failure to talk to the police post-arrest.

Defendant seeks to avoid the waiver rule of *Doyle* by asserting that the prosecutor committed misconduct in soliciting the disputed evidence because it constituted "intemperate behavior [that] . . . comprise[d] a pattern of conduct so egregious that it infect[ed] the trial with such unfairness as to make the conviction a denial of due process." We think not. We have already explained that admitting the evidence relating to defendant's failure to communicate with the victim's family, whether before or after his arrest, did not comprise any error supported by precedent to which defendant can point, and was brought on by defendant's own statement on the stand, which was not in response to a question by the prosecutor. Thus, we can hardly agree with defendant that eliciting the contested evidence amounts to a pattern of egregious conduct by the prosecutor or the use of "deceptive or reprehensible methods" by him. As to defendant's failure to talk to the police following his arrest, we have already discussed the minimal prejudicial nature of this evidence in light of other evidence that was admitted without objection, the ameliorative effect of defendant's explanation during redirect, and the offer made by the trial court, which defendant declined, that would have limited the use of this evidence by the jury. Moreover, prosecutorial misconduct, like *Doyle* error, must be objected to at trial in order to serve as a basis for error on appeal, and this was not. (*People v. Brown* (2003) 31 Cal.4th 518, 553.) We do not consider defendant's taking

24

issue with this evidence for the first time during discussions on jury instructions to constitute a timely objection for either *Doyle* error or prosecutorial misconduct.

1. *Jury Instruction*

    a. *Voluntary Manslaughter*

    1. *Unintentional Killing Without Malice During an Inherently Dangerous Felony*

Defendant here contends that the trial court had a sua sponte duty to instruct the jury on voluntary manslaughter[22] on the theory that he unintentionally killed the victim without malice during the inherently dangerous felony of assault by means of force likely to cause great bodily injury and that failure requires reversal of his conviction. He concedes that his entire argument rests on the outcome of *People v. Bryant* (2013) 56 Cal.4th 959, which was pending at the time the briefing in this case was authored. *Bryant* has since been decided. It held that voluntary manslaughter requires either an intent to kill or conscious disregard for life. (*Id*. at p. 969.) The California Supreme Court concluded, "A defendant who has killed without malice in the commission of an inherently dangerous assaultive felony must have killed without either an intent to kill or a conscious disregard for life. Such a killing cannot be voluntary manslaughter because voluntary manslaughter requires either an intent to kill or a conscious disregard for life. To the extent that *People v. Garcia* . . . [(2008)] 162 Cal.App.4th 18[23] suggested

---

    **22** The jury was instructed on voluntary manslaughter on the theory that the victim had been killed as a result of imperfect self defense.

    **23** Defendant relied on *Garcia* in support of his position.

otherwise, it is now disapproved. [¶] Because a killing without malice in the commission of an inherently dangerous assaultive felony is not voluntary manslaughter, the trial court could not have erred in failing to instruct the jury that it was." (*Id.* at p. 970.)

2. *Heat of Passion*

"'A criminal defendant has a constitutional right to have his or her jury determine "every material issue presented by the evidence" and this includes the right, where appropriate, to have the jury instructed on lesser included offenses.' [Citation.]" (*People v. Friend* (2009) 47 Cal.4th 1, 51.) "In a murder case, trial courts are obligated to instruct the jury on defenses supported by substantial evidence that could lead to conviction of the lesser included offense of voluntary manslaughter, even where the defendant objects, or is not, as a matter of trial strategy, relying on such a defense." (*People v. Moye* (2009) 47 Cal.4th 537, 541 citing *People v. Breverman* (1998) 19 Cal.4th 142, 162-163 (*Breverman*).) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*Breverman*, at p. 162.) We review de novo an alleged failure of the trial court to instruct on a lesser included offense. (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

Voluntary manslaughter includes the "unlawful killing of a human being without malice . . . [¶] . . . upon a sudden quarrel or heat of passion." (§ 192.) "An intentional,

26

unlawful homicide is 'upon a sudden quarrel or heat of passion' . . . and is thus voluntary manslaughter . . . if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an '"ordinary [person] or average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'" [Citations.] "'[N]o specific type of provocation [is] required . . . .'" [Citation.] Moreover, the passion aroused need not be anger or rage, but can be any ""[v]iolent, intense, high-wrought or enthusiastic emotion"" [citation] other than revenge [citation]. 'However, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter . . . .' [Citation.]" (*Breverman*, *supra*, 19 Cal.4th at p. 163.) Substantial evidence must consist of """evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." [Citation.]'" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1008.)

A trial court need not give a requested instruction based on speculation and conjecture. (*People v. Young* (2005) 34 Cal.4th 1149, 1200.) "Adequate provocation . . . must be affirmatively demonstrated." (*People v. Lee* (1999) 20 Cal.4th 47, 60; *People v. Dixon* (1995) 32 Cal.App.4th 1547, 1552.) In determining whether there is substantial evidence to support an instruction, the trial court is bound to take the defendant's testimony, at least for this limited purpose, as entirely true. (*People v. Wilson* (1967) 66 Cal.2d 749, 762.)

The standard of prejudice to be applied is still a matter of debate (*People v. Millbrook* (2014) \_\_\_Cal.App.4th \_\_\_,\_\_\_,) so we will assume that the failure to give instructions supported by substantial evidence requires reversal unless we can conclude, beyond a reasonable doubt, that the failure to give the instruction did not contribute to the verdict. (See *Chapman v. California*, *supra*, 386 U.S. 18.)

Defendant asserts that the trial court erroneously rejected his request that the jury be instructed on voluntary manslaughter on the theory of heat of passion. Defendant points to three pieces of evidence he claims supported an instruction on heat of passion. He appears to argue that these three pieces of evidence, when considered together, constitute sufficient evidence of heat of passion to make the trial court's refusal to give the instruction reversible error. We are troubled with his reliance on one piece of evidence that came from the witness's version of the killing and two that came from his. The two versions were very different. While a jury is free to believe some parts of a person's testimony and disbelieve others, there is no basis in logic for this jury to have picked one part of the witness's story and two parts of the defendants that defendant here argues establish heat of passion, while disbelieving those parts of their stories that supported a finding of anything other than heat of passion. However, we will consider these pieces of evidence both separately and together.

The first is the testimony of the witness that the victim danced with and touched the codefendant. To the extent the jury believed that the killing was motivated by *something,* this had to be the motive, as there was no evidence of any other presented.

28

We have two problems with this evidence serving as the basis for the instruction. The first was best expressed in *People v. Roundtree* (2013) 56 Cal.4th 823, 855, "'The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. . . . "[T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinary reasonable person under the given facts and circumstances . . ."' [Citation.] In this case, the subjective component is missing. There is no evidence, and defendant's confession supplies none, that he killed in the heat of passion. He claimed the first shot was an accident, not a killing in the heat of passion. The objective component is also missing." There must be *some evidence* that the defendant was *actually* under the influence of the heat of passion *and acted under that influence* in killing the victim. (*People v. Moye* (2009) 47 Cal.4th 537, 550 (*Moye*); *People v. Manriquez* (2005) 37 Cal.4th 547, 585-586; *People v. Lasko* (2000) 23 Cal.4th 101, 108; *People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1016.) Where, as here, the only direct evidence of defendant's mental state undermines a claim of heat of passion, it is proper for the trial court to refuse to instruct on heat of passion. (See *People v. Jackson* (1980) 28 Cal.3d 264, 306, disapproved on other grounds in *People v. Cromer* (2001) 24 Cal.4th 889, 901 fn. 3.)

Similar to *Roundtree*, here, defendant repeatedly claimed that he delivered the fatal blows because he was afraid for his life, not because his reason was obscured by

passion. In fact, he testified that he was unaware that the victim had danced with the codefendant, and even if the victim had, and had put his hands on her hips, defendant would not have gotten mad. Additionally, as to the objective component of heat of passion, defendant fails to cite any authority holding that dancing with a person's significant other, during which there is hand-to-hip contact, is sufficient provocation for killing. Simple assault does not support a heat of passion instruction, nor does taunting words, a technical battery or slight touching. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826, 827; *People v. Wells* (1938) 10 Cal.2d 610, 623.) The second problem is the amount of time that elapsed between defendant learning of the dancing and his infliction of the fatal blows. During this period, defendant was conciliatory towards the victim, asking him after he had knocked the victim down the second time what was going on. Additionally, defendant testified that after the victim then rushed at him with his fists swinging, defendant lit into him, hitting him in the face and defendant again dropped him, defendant stopped and did not come towards the victim because the victim was his best friend. This is completely inconsistent with the theory that defendant was so upset with the victim over the latter dancing with the codefendant and touching her hips in the process that defendant delivered the fatal blows. In *People v. Souza* (2012) 54 Cal.4th 90, 117, the appellate court concluded, "[T]he amount of time that had elapsed between the allegedly provocative act and the crimes made defendant's actions consistent with planned revenge and such a desire for revenge cannot objectively satisfy the provocation requirement." A pause between the so-called provocative event and the killing, even if as

short as a few minutes, demonstrates that the two are not part of continuous, chaotic response.  (See *People v. Breverman* (1998) 19 Cal.4th 142, 163, 164; *People v. Middleton* (1997) 52 Cal.App.4th 19, 34, overruled on other grounds in *People v. Gonzales* (2003) 31 Cal.4th 745, 752, fn. 3.)  Additionally, a rational exchange between the defendant and the victim or other intervening acts by the defendant demonstrate that the defendant's passions did, in fact, cool.  (See *People v. Butler* (2005) 127 Cal.App.4th 49, 61; *People v. Golsh* (1923) 63 Cal.App. 609, 617.)

The other pieces of evidence to which defendant points in claiming heat of passion is his testimony that the victim called the codefendant a derogatory name and "engaged defendant in a fight, almost putting him through a window."

Defendant's testimony as just mentioned also severely undermines any claim that he was so inflamed by the victim calling the codefendant a name that he killed the victim because the name calling occurred before the fatal blows were delivered and after defendant behaved in a conciliatory fashion towards the victim.  We further note that according to defendant, he never acted aggressively towards the victim, except in response to an act of aggression on the part of the victim.  This does not support a claim that defendant was so inflamed by the pre-window skirmishes between the victim and defendant that he was driven to inflict the fatal blows.  While defendant testified that he did not begin "fighting for his life" until he and the victim almost went through the window, it was the victim, after that point, in continuing to hold on to defendant and either coming at defendant or trying to again throw him across the room that resulted in

31

the fatal beating. Defendant did not testify that his reason was so obscured by passion at that point that he inflicted those blows. He testified that he was trying to save his own life. As the People correctly point out, "[A] trial court should not instruct on heat-of-passion voluntary manslaughter where the same facts would give rise to a finding of reasonable self-defense." (*People v. Wickersham* (1982) 32 Cal.3d 307, 327, 328, overruled on other grounds in People v. Barton (1995) 12 Cal.4th 186, 201.)

For the same reasons, we conclude that the evidence of all three incidents, considered together, was insufficient to require the giving of heat of passion instructions.

Finally, we are persuaded, beyond a reasonable doubt, that had the jury been given the option of convicting defendant of voluntary manslaughter under the heat of passion theory, they would not have done so. This is so because the jury's verdict of first degree murder, i.e., willful, premeditated, deliberate is inconsistent with a finding of heat of passion. (*People v. Mincey* (1992) 2 Cal.4th 408, 438; *People v. Wharton* (1991) 53 Cal.3d 522, 572.) Indeed, one of the instructions given the jury on first degree murder stated that "a decision to kill made rashly, . . . or without careful consideration is not deliberate and premeditated." On the other hand, the standard instruction on heat of passion provides that it must "have caused a person . . . to act rashly and without due deliberation . . . ." (Judicial Council of California Criminal Jury Instructions, CALCRIM No. 570.) Additionally, CALCRIM No. 522 was given in this case, which provided, "Provocation may reduce a murder from first degree to second degree. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that a

32

defendant committed murder, but was provoked, consider the provocation in deciding whether the crime was first or second degree." In finding defendant guilty of first degree murder the jury necessarily found no provocation. And, the provocation required for reducing first degree murder to second degree is broader than the provocation required for voluntary manslaughter—the former has no reasonableness requirement. (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306; *People v. Padilla* (2002) 103 Cal.App.4th 675.)[24] Additionally, this jury rejected the defense of self defense and the mitigating circumstance of imperfect self defense. In *Moye*, the California Supreme Court held, "Once the jury rejected defendant's claims of reasonable and imperfect self-defense, there was little, if any, independent evidence remaining to support his further claim that he killed in the heat of passion, and *no direct testimonial evidence from defendant himself* to support an inference that he subjectively harbored such strong passion, or acted rashly or impulsively while under its influence *for reasons unrelated to his perceived need for self-defense*." (*Moye*, *supra*, 47 Cal.4th at p. 557.) Finally, there was very strong evidence of first degree murder, as was set forth above.

 b. *Involuntary Manslaughter*

 The jury was instructed, according to CALCRIM No. 580, "Next section deals with the lesser-included offense of involuntary manslaughter. When a person committed

---

[24] We note that in holding that the failure to give heat of passion instructions was prejudicial under the *Chapman* standard in *People v. Thomas*, the appellate court considered as significant the fact that the trial court had also not given CALCRIM No. 522, which was given here. (*People v. Thomas* (2013) 218 Cal.App.4th 630, 645, 646.)

33

an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary murder. The difference between other homicide offenses and involuntary malice depends on whether the person was aware of the risk to life that his or her actions created and consciously disregarded that risk. [¶] An unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another and done in conscious disregard of that risk is voluntary manslaughter or murder. An unlawful killing resulting from a *willful act* committed without intent to kill and without conscious disregard of the risk to human life is involuntary [manslaughter]."

This instruction omitted those portions of CALCRIM No. 580 that addressed committing a lawful act, but with criminal negligence, which act caused the death of the victim. (CALCRIM No. 580) Defendant here contends that that portion of CALCRIM No. 580 which defined criminal negligence should have been given to this jury. However, the instruction on involuntary manslaughter was not given because the jury could have found that defendant committed a lawful act, but in a criminally negligent fashion. It was given because the jury could have found that defendant committed a battery, and the battery caused the death of the victim. Defendant here cites no authority holding that a crime which "posed a high risk of death or great bodily injury because of the way in which it was committed," was not committed with criminal negligence. In fact, in *People v. Cox* (2000) 23 Cal.4th 665, 672, 673, 674, the California Supreme Court equated criminal negligence with "an act this is 'dangerous to human life or

34

safety'" or an act "'dangerous under the circumstances of its commission'" or an act "'conducted in a dangerous . . . manner[.]'" *Cox* went on to observe, "[M]isdemeanor assault and battery may support a conviction of involuntary manslaughter . . . if shown to be dangerous under the circumstances of their commission." (*Id*. at p. 674.) "[W]here involuntary manslaughter is predicated on an unlawful act constituting a misdemeanor, it must still be shown that such misdemeanor was dangerous to human life or safety under the circumstances of its commission." (*Id*. at p. 675.) Although not relying on this, the appellate court in *People v. Butler* (2010) 187 Cal.App.4th 998 (*Butler*), rejected the same contention defendant asserts here, in a case where the defendant was convicted of involuntary manslaughter, saying, "As stated in *People v. Rodriguez* [(1960) 186 Cal.App.2d 433,] 440, 'an act is criminally negligent when a man of ordinary prudence would foresee that the act would cause a high degree of risk or great bodily harm.' This is essentially the same standard provided to the jury by the trial court; i.e., defendant committed involuntary manslaughter if the 'defendant committed a crime that posed a high risk of death or great bodily injury because of the way in which it was committed.' [¶] We note the jury instruction did not reference the objective standard applicable to involuntary manslaughter; i.e., whether a reasonable person would have known that the act created a high risk of death or great bodily injury. However, there is nothing to suggest that the failure to provide the jury with this information harmed defendant. The jury was merely told that the crime must be committed in a manner that posed a high risk of death or great bodily harm; the jury was not told that defendant need *not* be

35

subjectively aware of the high risk as long as a reasonable person would be aware. Absent direction on the standard to apply, the jurors would likely have looked at the circumstances to determine whether in their view there was a high risk. Because the jurors' unanimous conclusion on this point reflects the viewpoint of 12 persons drawn from the community at large, this approach could equate with the objective (reasonable person) standard. In any event, even if the jury improperly applied a subjective standard when evaluation mens rea (i.e., whether the circumstances showed defendant was aware of the risk), this would have inured to defendant's benefit as the jury would have had to agree unanimously on a fact not required for an involuntary manslaughter conviction.[25]

[¶] . . . [¶] Although instruction on criminal negligence on the language of CALCRIM No. 580 would have further expanded on the concept of a gross lack of due caution, the additional information on this subject was not necessary for the jury's understanding of the case. The criminal negligence portion of CALCRIM No. 580 sets forth the requirements that the defendant acted with more than 'ordinary carelessness, inattention, or mistake in judgment,' and that the defendant's conduct was 'so different from the way an ordinarily careful person would act' that the conduct 'amounts to disregard for human life or indifference to the consequences of that act.' [Citation.] These concepts were sufficiently conveyed to the jury through the instruction stating that the crime must be

---

**25** We agree with the People that *Butler* cannot be distinguished from the instant case here merely because the causation language given in *Butler* was not given here. (*Butler* at p. 1014.)

committed in a manner that poses a high risk of death or great bodily injury. Reasonable jurors would have understood that commission of a crime in a manner that posed a high risk of death or great bodily injury constitutes conduct that is more than mere carelessness or inattention and reflects a disregard or indifference to life and human safety. [¶] The jury was also instructed that the predicate offenses had to be committed willfully or knowingly, thus ensuring the jury understood that accidental conduct could not support an involuntary manslaughter verdict.[26] Reasonable jurors would have recognized that purposeful or knowing conduct committed in a manner posing a high risk of death or great bodily harm is more than mere carelessness or mistaken judgment." (*Butler*, *supra*, 187 Cal.App.4th at pp. 1014-1015, fn. omitted.)

What defendant suggests is that the jurors, who were required to find that defendant committed "a crime that posed a high risk of death or great bodily injury[,]" also had to find that he "acted in a reckless way that create[d] a high risk of death or great bodily injury" and that a reasonable person would have known that acting in that way would create such a risk. In our view, the two are the same.

Finally, the fact that this jury convicted defendant of first degree murder, which, as we have already stated, is supported by very strong evidence, demonstrates a lack of

---

**26** The jury here was given the definition of battery, including the requirement that it be committed willfully, i.e., willingly or on purpose and was also instructed that the killing was "caused by a willful act."

prejudice, under either standard, resulting from any deficiency in the instructions on involuntary manslaughter.

3. *Insufficiency of the Evidence*

    a. *Premeditation and Deliberation*

Defendant begins his attack on the sufficiency of the evidence by pointing out that the prosecutor had argued to the jury that defendant calling the victim into the bedroom demonstrated premeditation and deliberation. He then calls our attention to *People v. Anderson* (1968) 70 Cal.2d 15, and its reliance on the fact that the defendant there had no motive for killing the victim as a basis for concluding there was insufficient evidence of premeditation and deliberation. However, here, there was evidence of motive, i.e., the codefendant's obvious displeasure with the victim dancing with her and putting his hands on her hips, which the jury could reasonably infer she promptly reported to defendant. Given this, defendant asking the victim to come into the bedroom was not, as defendant now claims, "ambiguous conduct." It was the beginning of a number of acts by the defendant that culminated in the death of the victim, motivated by the codefendant's report to him. The fact that the codefendant was present for this utterly gruesome event reinforces this inference that her report was the catalyst for the crime. The fact that defendant did not confront the victim in the living room about the latter's conduct, and acted as though there was nothing wrong while escorting the victim into the bedroom further reinforces the finding of planning.

    b. *Murder*

Relying on a case holding that assault with a fist, absent aggravating circumstances, will not support a murder conviction "[a]lthough [such an assault] may be [done] in such a manner and under circumstances to make [it] murder", defendant contends there was insufficient evidence to support the verdict. These were such circumstances—10 to 16 blows to the chest and back by a defendant, who by his own admission was uninjured and outweighed the victim by 50 or 60 pounds, some while holding the victim stationary by his shoulders, fully supports the verdict. Defendant relies on his own testimony that up to the point where he began hitting the victim in the body, he hit him only in the face. This testimony was in response to a leading question by defense counsel and was probably completely disbelieved by the jury, based on the number of rib fractures that were inflicted on the victim. Moreover, just because defendant confined himself initially to the victim's face did not make his body blows any less lethal.

4. *Restitution*

The sentencing court ordered defendant to pay direct restitution of $488.32 and $7,500 to the Victim's Compensation Fund. The same had been ordered for the codefendant. (*People v. Martinez*, E053559, filed 7/12/12, p. 34.) As part of our disposition of her appeal, we directed the trial court to amend her abstract of judgment and minutes of the sentencing hearing to reflect that her obligation in this regard was joint and severable with defendant's. (*Ibid.*) In light of this, the parties agree that defendant's should be also.

39

## DISPOSITION

The trial court is directed to amend the abstract of judgment and the minutes of the sentencing hearing to show that the restitution order for defendant is joint and severable with the codefendants. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

RICHLI
J.

CODRINGTON
J.